# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR AN ARREST WARRANT

I, James A. Faulkner, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I am employed by the United States Department of Justice as a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since 2012. I have been assigned to the Norfolk field office, where my primary duties include, but are not limited to, the investigation of kidnappings, human trafficking, bank robberies, fugitives, violent incident crimes, commercial robbery, homicides, gang and narcotics organizations, organized criminal enterprises, and covert surveillance.

2. I make this affidavit in support of a criminal complaint and an arrest warrant for the arrest of ERIC BRIAN BROWN for kidnapping, in violation of 18 U.S.C. § 1201(a)(1) and (2).

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 1201(a)(1) and (2) has been committed by ERIC BRIAN BROWN.

## BACKGROUND

5. The Federal Bureau of Investigation (FBI) is conducting a multistate investigation into the kidnapping and death of a black female named Ashanti M. Billie (hereinafter referred to as "victim") who resided in Virginia Beach, Virginia, and whose body was recovered in tall



grass near a wooded area in Charlotte, North Carolina. The victim was employed as an assistant manager at a Blimpie's fast food restaurant located on the Joint Expeditionary Base Little Creek. The victim had a key for the business and was responsible for a petty cash bag. On September 18, 2017, the victim was reported missing after she did not arrive to work for her scheduled shift as she intended to do. The crime is believed to have occurred or commenced on Joint Expeditionary Base Little Creek, which is within the special maritime and territorial jurisdiction of the United States.

## PROBABLE CAUSE

### Victim's Abduction and the Recovery of Her Body

6. On September 18, 2017, at approximately 4:00 a.m., Ashanti Billie left her residence in Virginia Beach, Virginia, in her vehicle to go to work at a Blimpie's fast food restaurant located on the Joint Expeditionary Base Little Creek. The victim left for work early to clean the restaurant for a health inspection scheduled later that day. The victim was reported as wearing dark colored clothing.

7. On September 18, 2017, at approximately 4:44 a.m., the victim's vehicle was seen on recorded surveillance video entering Gate 3 of Joint Expeditionary Base Little Creek, in a light colored car with a dark top consistent with the victim's personal vehicle, a white 2014 Mini Cooper. The victim's vehicle was then seen on surveillance video exiting the same gate at approximately 4:46 a.m. It is known to investigators that an unrelated vehicle accident on base prevented the victim from driving from Gate 3 to the Blimpie's. At approximately 4:58 a.m., the victim's vehicle was recorded on video surveillance entering Gate 1. Gate 1 is located at the intersection of Shore Drive and Little Creek Road and is within 250 yards of the Blimpie's



restaurant. The driver of the vehicle, in all three of those videos appears to be wearing dark-colored clothing consistent with what the victim was reported to be wearing.

8. At approximately 5:00 a.m., video surveillance within Joint Expeditionary Base Little Creek recorded the victim's vehicle circle the Blimpie's. At approximately 5:33 a.m., Gate 1 video surveillance recorded the victim's vehicle, exit Gate 1 of Joint Expeditionary Base Little Creek. The driver of the vehicle in this video appeared to be wearing light-colored clothing.

9. On September 18, 2017, at approximately 5:40 a.m., a residential video surveillance camera recorded a light-colored car with a dark top, consistent with the victim's vehicle, stopping at a construction dumpster near the intersection of Tallyho Terrace and Azalea Garden Road in Norfolk, Virginia, approximately two miles from the base. An unknown driver exited the vehicle and appeared to toss an object into the construction dumpster. The unknown driver appeared to be an average weight male, approximately 5'9" tall and wearing light colored clothing. No passengers were seen seated in the vehicle other than the driver. A few hours later that morning, construction workers located the victim's cell phone in the dumpster and turned it in to the Norfolk Police Department.

10. On September 23, 2017, the victim's vehicle was recovered in the Ocean View section of Norfolk, Virginia, on Lakeside Drive. The vehicle was not parked flush to the curb, windows were partially rolled down, doors unlocked, and the key fob was on the passenger seat. A work shirt for the victim, dark colored pants, and one shoe consistent with the victim's known clothing were found within the rear compartment of the vehicle. The pants and one shoe appear to have been removed together with the shoe bound inside a pant leg. Furthermore, dirt and debris were found on the inside of the pants consistent with being removed while outside and on the ground. A piece of bank coin wrapper was recovered from inside the vehicle.

11. Dirt and vegetative debris were present on the undercarriage of the victim's vehicle, consistent with off-road driving. Only one partial latent print was recovered from the search of the vehicle. Crime scene technicians believe the vehicle was found in a condition consistent with being wiped clean of other latent prints.

12. On September 29, 2017, the victim's body was recovered, by the Charlotte Police Department, on the rear property of a church located at 1729 Grier's Grove Road, Charlotte, North Carolina. This location is approximately 330 miles (approximately 5.5 hours by car) from the victim's Virginia Beach address.

13. The victim's body was located near a wooded area in tall grass. The body was found in the supine position with the legs spread. The body condition showed progressed decomposition inconsistent with a recent disposal. The skin appeared to have begun a natural mummification process. The victim's mouth showed evidence of missing teeth. The victim was without pants and no pants were recovered from the scene. The victim's underwear were found near her head. The victim's arms were above her head and bound up inside a dark colored sweatshirt and shirt. There was plastic sheeting found under the victim. A plastic glove was recovered near the body.

14. During interviews conducted on or about September 30, 2017, several witnesses described seeing a vehicle consistent with the victim's vehicle during the week of September 18 parked at various locations in the surrounding neighborhood of both 1517 Crawford Drive and 1729 Grier's Grove Road.

**Information from workers in and around Blimpie's**

15. The victim's coworkers reported to investigators that a suspicious male known as ERIC BRIAN BROWN frequently visited the Blimpie's restaurant and was often seen in the

4

neighboring buildings. BROWN participated as a day laborer in the construction of the Blimpie's, which was completed during the summer of 2017.

16. The Blimpie's restaurant is co-located in a building that also contains a 24-hour laundromat directly next door, a barbershop, and a convenience store. Prior to the victim's disappearance, witnesses place BROWN consistently in and around this building at all hours of the day and night. BROWN's construction coworkers reported that upon their showing up for work BROWN was already at the construction site, in the laundromat directly next to the Blimpie's, waiting for them to show up.

17. BROWN is not known to have a vehicle. Interviews of BROWN's construction coworkers revealed that on several occasions, they gave BROWN rides "home," but BROWN always asked to be dropped off in a parking lot and none of the coworkers ever saw BROWN actually enter a house or apartment.

18. Coworkers of the victim reported that prior to the victim's disappearance, BROWN was at the laundromat next to the Blimpie's so frequently that they believed he worked there. Further, they stated that BROWN would visit the Blimpie's almost every day. Some of the employees became uncomfortable because of BROWN's continued presence and sexual advances.

19. Witnesses reported seeing BROWN engaging in conversation with and attempting to flirt with the victim on several occasions while the victim was working at the Blimpie's. One witness recalled hearing a conversation where BROWN commented directly to the victim about her "big ass." On another occasion, BROWN mentioned to a coworker of the victim that he believed the "bands would make her dance" in reference to the victim. This comment is known to investigators to mean the victim would dance for money (money bands).

5



20.  Neither Blimpie's personnel nor BROWN's former construction coworkers have seen BROWN at the Blimpie's or any of the neighboring locations since the victim's disappearance.

**Additional Information about BROWN**

21.  BROWN has access to the naval base as a retired navy petty officer. During his approximately twenty-one year career in the U.S. Navy, BROWN served as an Information Systems Technician ("IT"). ITs specialized in communications technology and computer network systems.

22.  In military documents, BROWN has 1517 Crawford Drive, Charlotte, North Carolina, listed as his address. In 2011, on his military DD214 form (Certificate of Release or Discharge from Active Duty), BROWN listed his "home of record at time of entry" as Charlotte, NC. On the same form, BROWN listed his forwarding mailing address as 1517 Crawford Drive, Charlotte, North Carolina. Investigators found mail at 1517 Crawford Drive addressed to ERIC BROWN as recently as September 29, 2017.

23.  BROWN's residence at the age of 18 was 1517 Crawford Drive, Charlotte, North Carolina. BROWN has a brother, D.B., who continued to reside in that residence for an unknown amount of time.

24.  An interview with D.B., indicated that ERIC BROWN has not communicated with his brother in over three years due to the family losing their childhood home, 1517 Crawford Drive, to foreclosure.

25.  Notably, this residence is approximately 300 yards from where the victim's body was discovered.



26. The property on which the body was found is owned by and located next to the church that BROWN attended vacation Bible school as a child.

27. BROWN's physical description, is consistent with the individual in the surveillance video recovered from the intersection of Tallyho Terrace and Azalea Garden Road in Norfolk, Virginia, where the victim's phone was recovered.

28. On October 27, 2017, the media obtained and released the residential surveillance video from Tallyho Terrace and Azalea Garden Road in Norfolk, Virginia. The video showed an unknown driver exiting the victim's vehicle and tossing the victim's phone into a construction dumpster. On October 31, 2017, one of the construction workers who helped build the Blimpie's, and who worked with BROWN for approximately 90 days, contacted the FBI. In a telephonic interview, the worker stated that he watched the residential surveillance video and wanted to report that the man in the video was ERIC BROWN. The witness said he recognized the way the individual in the video walked and further stated that he believed the clothes that BROWN was wearing in the video were clothes that he had given to BROWN.

29. On October 2, 2017, FBI Agents interviewed Confidential Witness 2 (hereinafter "CW2"). BROWN stated to CW2 that BROWN hates African American women because they are "gold diggers," they are "hypnotized by social media" and they "only want guys with all the money." They are constantly buying hair, dyeing their hair, and buying wigs.

**BROWN's Location around September 18, 2017**

30. A records check of base entry logs indicate that BROWN had entered through Gate 1 of Joint Expeditionary Base Little Creek, on the afternoon of September 14, 2017. This is supported by security camera video from Joint Expeditionary Base Little Creek.



31. A detailed review of BROWN's wireless internet usage data indicates that BROWN used his mobile devices nearly every day from September 1 to September 29, 2017. The only day in that time-period that there was no usage data is September 18, 2017, which is the day the victim went missing. Further, the review of his wireless internet usage data indicates that BROWN was on base from September 14, 2017, until late in the evening of September 17, 2017, which is when all usage data ceased until starting again on September 19, 2017.

32. A review of BROWN's financial records indicates that BROWN made online purchases on September 16, 2017 at approximately 4:00 p.m., and on September 17, 2017 at approximately 4:00 p.m. Both of these charges occurred from an IP address within the Joint Expeditionary Base Little Creek.

33. A review of security camera video from all of the gates on the base revealed no evidence of BROWN ever leaving the base from September 14, 2017 through September 18, 2017.

34. A records check of base entry logs indicate that BROWN had reentered Joint Expeditionary Base Little Creek through gate 1 on the afternoon of September 19, 2017. This is supported by security camera video from Joint Expeditionary Base Little Creek.

35. A review of BROWN's phone's web history indicates that when BROWN first initiated web activity on September 19, 2017, BROWN made numerous searches of Norfolk news on one of his phones to include "police looking for man," "Norfolk police looking for man in connection with homicide," "amber alert sept 2017," "missing woman and baby," and "missing woman and man."

36. Additionally, BROWN searched for information on Charlotte, North Carolina, news websites on September 21, 2017, which was 8 days before the victim's body was recovered



by law enforcement. And on September 22, 2017, BROWN entered searches for "JEB Little Creek Blimpies" and a search regarding parents of a missing college student.

**BROWN's Activities Leading to His Arrest on Minor State Charges**

37. On September 27, 2017, BROWN was located by a law enforcement surveillance team on the Norfolk Naval Base. BROWN was observed the entire afternoon and evening of September 27, 2017 and the early morning hours and afternoon of September 28, 2017. BROWN was observed sleeping in a chair inside the base gym's television room. When he awoke, he spent hours watching TV. When BROWN left the TV room, he entered the locker room, took a shower, and changed clothes. When BROWN exited the gym, he was observed wearing a black backpack with white stripes and wandering randomly in an erratic path between buildings, attempting to open random car doors, and waving down random vehicles.

38. During the early morning of September 28, 2017, Brown entered a 24-hour laundromat on Norfolk Naval Base and went to sleep inside the laundromat. Once Brown awoke and left the laundromat, he wandered around the base again.

39. At approximately 3:00 p.m., on September 29, 2017, BROWN was at a Hardee's fast food restaurant located at the intersection of Baker Road and Northampton Boulevard. BROWN approached a member of the surveillance team and confronted the officer.

40. BROWN stayed at the Hardee's fast food restaurant for another few hours. BROWN then exited the restaurant and walked over to the laundromat located at 5765 Northampton Boulevard. BROWN then walked to several other businesses on Northampton Boulevard.

41. At approximately 7:45 p.m., BROWN entered the McDonald's located at 5833 Northampton Boulevard. While at the McDonald's, BROWN met (Confidential Witness 1,

9



hereinafter CW1). CW1 is a known prostitute and has a state record for prostitution. When BROWN left the McDonald's, he followed CW1 to the Econo Lodge located at 5819 Northampton Boulevard.

42. At approximately 8:21 p.m., BROWN entered CW1's room at the Econo Lodge. Shortly after entering the room, BROWN left the room and walked down the street. According to CW1, BROWN had inquired about "a date." This term is known to investigators to mean a sexual appointment. CW1 asked BROWN if he had any money or condoms, and then instructed BROWN to go get both and cigarettes.

43. At approximately 8:30 p.m., BROWN entered the BP gas station next to the same laundromat located on Northampton Boulevard. BROWN was observed buying cigarettes. BROWN then returned to the Econo Lodge.

44. At approximately 8:45 p.m., BROWN went back to CW1's room at the Econo Lodge. According to CW1, when BROWN returned he had condoms, cigarettes, but no money. CW1 advised BROWN she would not have sex without money. BROWN left the Econo Lodge again to go get money. Bank records indicated BROWN had withdrawn money from an ATM at this time.

45. When BROWN returned to CW1's room, CW1 told BROWN that she could not do the "date" because her family member arrived and they were in her room. BROWN was carrying a blue laundry bag, which he asked if he could leave in her room. CW1 was okay with BROWN leaving the bag in her room because it was her understanding that BROWN was just going to get another room in the Econo Lodge for them to have their "date" in.

46. In the late hours of September 29, 2017, BROWN began walking in the area of Northampton Boulevard. BROWN trespassed on private property and cut through wooded areas.

10



At approximately 4:15 a.m., on September 30, 2017, BROWN began walking up and down on/off ramps of Interstate 64. Officers believed this posed a safety hazard and at approximately 4:40 a.m., BROWN was approached by a Norfolk Police Officer in a marked unit and detained for trespassing.

47. BROWN refused to answer any of the officer's questions and he felt cold to the touch. The officer requested an ambulance. While waiting for the ambulance, Brown was searched for officer safety. BROWN had a wallet with his identification card in it, which identified him as ERIC BROWN. Due to BROWN refusing to talk to the officer, the ID card was what the officer used to identify BROWN.

48. BROWN was subsequently arrested on the trespassing charge. At the time of his arrest, BROWN had the following items on his person: a wallet (containing various items including, but not limited to: $60 cash, identification cards, credit cards, and various customer loyalty cards), various keys, a white Samsung smartphone, an unused condom and a used condom. All items were inventoried and placed into evidence.

49. During the booking process at Norfolk City Jail when asked his place of birth, a standard booking question, BROWN replied, "Charlotte, NC." He later added that he "goes back and forth from time to time." BROWN provided a home address of 7325 Woodall Road, Norfolk, VA. Investigators have not been able to link BROWN to this address.

50. Investigators have been unable to link BROWN to any current address found in law enforcement databases. NCIS agents are unable link brown to any housing facilities on either Norfolk Naval Base or Joint Expeditionary Base Little Creek.

51. Based on the investigation to date, investigators believe that BROWN is currently homeless and lives at random facilities/building on and off the bases. Investigators have



discovered that BROWN stores his belongings in lockers located at different facilities both on and off of the naval bases.

52. On October 1, 2017, a Virginia Beach Police Department Detective obtained two warrants for BROWN on charges of solicitation of prostitution and frequenting a bawdy place. The warrants were entered into NCIC.

53. On October 3, 2017, BROWN was arrested by Virginia Beach Police on the solicitation charges. He was held at the Virginia Beach City Jail pending the posting of a bond. BROWN has not posted a bond.

54. On October 4, 2017, law enforcement officers also interviewed Confidential Witness 3 (hereinafter "CW3"). CW3 was in prison and he spoke to BROWN while they were detained. According to CW3, he told BROWN about a problem he had with a female witness who reported CW3 to the police. BROWN responded by saying that "someone should pay her a visit." During this conversation, BROWN made several violent references, such as "there ain't nothing like the first taste of blood. Sometimes it makes you do things that are unexplainable." BROWN also told CW3 that he has done some serious stuff.

55. On October 10, 2017, BROWN was interviewed at the Virginia Beach City Jail. BROWN was read his Miranda warnings. He waived his rights and agreed to talk. Among other things, BROWN was questioned about whether he was aware of anything occurring on the base on September 18, 2017. BROWN stated "no" and then said he had seen a news report about a "disappeared girl" on the television while he was at a laundromat. When asked if he knew Ashanti Billie, BROWN acted surprised and stated, "That's the girl's name," indicating he did not remember who she was until the interviewers said her name.



56. On October 27, 2017, BROWN was interviewed at the Virginia Beach City Jail. BROWN was read his Miranda warnings. He waived his rights and agreed to talk. Among other things, agents discussed with BROWN his activities on late September 17, 2017, and the day of September 18, 2017. BROWN confirmed that he was on Joint Expeditionary Base Little Creek on the evening of September 17, 2017. BROWN stated that he had been walking from Gate 5 to Gate 3 that evening. He said that he blacked out as he approached the area of Gate 3. He stated that he had no recollection of what he did for several days after that. Agents also specifically discussed the abduction and murder of the victim. At the end of the interview, BROWN confirmed that he could not say if he did anything to the victim. He also confirmed that he could not say he did not do anything. He agreed that he could not remember if he did anything to the victim.

57. The road on Little Creek base that runs from gate 5 to gate 3 continues in the general direction of gate 1, which is the gate closest to the Blimpie's.

**DNA Analysis of Victim's Clothes**

58. The victim's body and clothing were processed for evidence and on November 2, 2017, a forensic report was prepared by the Charlotte-Mecklenburg Crime Laboratory. On two separate articles of clothing, an unknown male DNA profile was identified. The two articles of clothing were the victim's zip-up hooded sweatshirt and the victim's shirt, which were found on the victim's body in Charlotte. The first male DNA profile was obtained from a swab of the pocket openings of the hooded sweatshirt. This DNA profile was compared to a buccal swab of ERIC BROWN. The male DNA profile from the hooded sweatshirt was consistent with the DNA profile of ERIC BROWN. The probability of this DNA profile belonging to any other



person is 1 in 2.7 quadrillion. The second male DNA profile was obtained from a swab of the outside, back center torso area of the victim's shirt. This DNA profile was compared with a buccal swab of ERIC BROWN. The male DNA profile from the shirt was consistent with the DNA profile of BROWN. The probability of this DNA profile belonging to any other person is 1 in 720 billion.

## **CONCLUSION**

59. Based on the foregoing, I believe that there is probable cause to believe that BROWN unlawfully kidnapped, abducted, and carried away the victim from a special maritime and territorial jurisdiction of the United States and did willfully transport the victim in interstate and foreign commerce, in violation of 18 U.S.C. § 1201(a)(1) and (2).

Respectfully submitted,

_____
James A. Faulkner, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on November 7, 2017.

_____
United States Magistrate Judge    Douglas E. Miller
Eastern District of Virginia      United States Magistrate Judge